IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | No. 1:10-CR-286-JEC-ECS |
| | : | |
| JOSE LUIS DE ALBA-REYES | : | |

**REPORT AND RECOMMENDATION**

This matter is before the Court on Defendant's motion to suppress. [Doc. 17]. The motion came on for evidentiary hearing on January 19, 2011. At the close of the evidence the Court took the motion under advisement pending preparation of a transcript and submission of a videotape of the traffic stop at issue. After a bench conference, the parties waived briefing and submitted the motion to the Court for decision. The transcript has been filed and the motion is ready for decision.

**I.
Issues**

The issues presented by this motion are: (1) whether Georgia State Patrol Officer Richard Barber validly stopped Defendant's vehicle on Interstate 75 near Forest Park on January 26, 2010; (2) whether the consent to search that was given by Defendant a few minutes after Trooper Barber issued written warnings to Defendant and returned his license was voluntary; and (3) whether the search thereafter of the vehicle that led to the discovery of suspected drugs in a hidden compartment in the  vehicle was within the scope

AO 72A
(Rev.8/82)

of the consent and otherwise valid. The Court concludes that the stop was valid, the consent was voluntary, and the subsequent search and Defendant's arrest were constitutional. The motion to suppress, therefore, should be **DENIED**.

## II.
## The Facts

In December of 2009 and January of 2010, the Drug Enforcement Administration ("DEA") was investigating drug trafficking between Chicago and Atlanta. (T. 5-6).[1] In particular, the agents were working with a cooperating source ("CS") who, in turn, was in contact with a drug supplier in Chicago. (T. 5-6). Numerous "controlled" telephone calls were made between the CS and the Chicago source which led to an arrangement for the delivery of two kilograms of heroin from Chicago to Atlanta. The source advised that the heroin would be transported by a courier in a hidden compartment of a vehicle, likely a Volkswagen Jetta, and that the narcotics would be delivered on January 26, 2010. (T. 6-7, 12). It was arranged that the courier would meet with an undercover officer, who would be posing as the cousin of the CS, at the shoe department at a Wal-Mart in Stockbridge, Georgia. (T. 6-8). The CS was provided with a description of what the courier would be wearing.

---

[1] References to the transcript of the January 19, 2011, evidentiary hearing will be cited as "(T. Pg)."

(T. 6, 12). It was also agreed that the CS and the courier would use the code word "music" to identify each other. (T. 8).

As arranged, the meeting occurred at the Wal-Mart on the afternoon of January 26. (T. 7). After an undercover officer and the courier met, they left the Wal-Mart together but in separate vehicles, planning to go to another location in order to remove the drugs from the hidden compartment. (T. 8-9). They headed north on Interstate 75 in tandem. (T. 8). Meanwhile, Agent Whipple of the DEA contacted Trooper Barber and advised him that DEA wanted him to be on the lookout for a Volkswagen Jetta with an Illinois license tag and to initiate a traffic stop.[2] (T. 24, 54).

Trooper Barber soon identified the Jetta with the Illinois tag and followed it. (T. 25). He also quickly observed two violations for which he could stop the vehicle – following too close and having a tag cover obstructing the tag. (T. 25). He activated his lights and pulled the Jetta over. (T. 26). The time was approximately 1:54 in the afternoon. (T. 39). He approached the vehicle, asked for a driver's license and insurance information and was provided with a Mexican driver's license and valid insurance card. (T. 27-28). Upon receiving these documents, Trooper Barber asked the

---

[2] Trooper Barber was assigned to the criminal interdiction unit which specializes in illegal narcotics and transport of bulk currency. (T. 23).

3

driver, the Defendant, to step out of the vehicle. (T. 28). There was no one else in the car. Trooper Barber engaged in small talk with Defendant, during which the Defendant stated that he had come from Chicago to get work in Atlanta but had gotten lost and that was why he was headed north. (T. 29). Trooper Barber observed that Defendant was very nervous, would not make eye contact, and paced back and forth as they spoke. (T. 29).

Trooper Barber returned to his vehicle and ran the driver's license through his computer. (T. 32-33). He printed out warnings for following too close and license obstruction and then gave the warnings, along with the Defendant's driver's license and insurance documents, to Defendant. (T. 34); see also [Gov. Exhs. 1,2]. He also warned Defendant about speeding but did not issue a written warning for this infraction. (T. 56). Approximately 10 to 15 minutes elapsed from the initiation of the stop to the issuance of the warnings. (T. 32-33).

After he had returned the papers and issued the warnings, Trooper Barber asked Defendant for permission to ask a few more questions. (T. 34,62). Defendant said "Sure." (T. 34). Trooper Barber then asked Defendant how long he would be staying and where he was going. (T. 34). The two were both still outside the vehicle during the questioning. (T. 34). The vehicle was not blocked in or detained in any way, although there was a second officer on the

scene. (T. 34-35). No weapons were drawn. (T. 35). After asking a few questions, Trooper Barber asked for consent to search the vehicle. (T. 35). Defendant gave his verbal consent at which time he was provided with a consent to search form written in Spanish. (T. 35). The Spanish form was used because Defendant seemed to be more comfortable with the Spanish version. (T. 35). He signed it. (T. 35-36); see [Gov. Exh. 3]. The time from the issuance of the warnings to the consent to search was approximately 2 to 3 minutes. (T. 44).

After Defendant signed the consent to search form, Trooper Barber asked him if he would drive the Jetta to the next exit to the State Patrol Post where they could more safely examine the vehicle. (T. 43). Defendant said "Yes." (T. 44). Defendant and the troopers proceeded to the Post parking lot where the vehicle was searched. (T. 45). On examination, the troopers found an anomaly in the area of the trunk and under the rear bumper, which "appeared as if [it] had been re-welded and Bondoed and spray painted." (T. 46). The troopers accessed the car's bumper supports and frame wells and observed bundles of suspected drugs wrapped in plastic and covered in grease. (T. 46-47). After accessing the frame wells, the officers were able to seize the bundles. (T. 46). Defendant was then placed under arrest and given his Miranda warnings, after which Defendant indicated that he wished to speak, but only to a Spanish-

5

speaking officer. (T. 48, 65). The officers also searched Defendant's person and took his wallet and two cell phones. (T. 48-50).

Later, DEA agent Luther Bowen, a Spanish-speaking agent, was called to Forest Park to interview Defendant. Agent Bowen interviewed Defendant, during which he read him his Miranda rights from a preprinted form. (T. 72). Agent Bowen also supplied Defendant with a hard copy of the form. (T. 72). The admissibility of any statement made after this point has not been challenged in this motion.

## III.
## Discussion

### A. The Applicable Law

"The Supreme Court has identified at least three separate categories of police-citizen encounters in determining which level of Fourth Amendment scrutiny to apply: (1) brief, consensual and non-coercive interactions that do not invoke Fourth Amendment scrutiny, Florida v. Bostick, 501 U.S. 429 (1991); (2) legitimate and restrained investigative stops short of arrests to which limited Fourth Amendment scrutiny is applied, Terry v. Ohio, 392 U.S. 1 (1968); and (3) technical arrests, full-blown searches or custodial detentions that lead to a stricter form of Fourth Amendment

6

scrutiny, Brown v. Illinois, 422 U.S. 590 (1975)." United States v. Perkins, 348 F.3d 965, 969 (11th Cir. 2003).

The initial stop in this case involves a Terry stop. Under the Terry doctrine, law enforcement officers may briefly detain a person for an investigatory stop if they have a reasonable, articulable suspicion, based on objective facts, that the person has engaged, or is about to engage, in criminal activity. Terry v. Ohio, 392 U.S. 1, 20-21, 29 (1968). The principles enunciated in Terry apply to traffic stops. United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2002) ("we analyze the legality of [traffic] stops under the standard articulated in Terry."). Accordingly, the police "may stop a vehicle when there is probable cause to believe that the driver is violating any one of the multitude of applicable traffic and equipment regulations relating to the operation of motor vehicles." United States v. Cooper, 133 F.3d 1394, 1398 (11th Cir. 1998)(involving a lane change violation).

Under Terry, an officer's investigation of a traffic stop must be "reasonably related in scope to the circumstances which justified the interference in the first place." 392 U.S. at 20. In addition, the traffic stop must be of a limited duration. The stop "may not last 'any longer than necessary to process the traffic violation' unless there is articulable suspicion of other illegal activity." Purcell, 236 F.3d at 1277 (quoting United States v. Holloman, 113

F.3d 192, 196 (11th Cir. 1997)); United States v. Boyce, 351 F.3d 1102, 1106 (11th Cir. 2003) (same).

An officer may only prolong a traffic stop in special circumstances.  First, police officers conducting a traffic stop may "prolong the detention to investigate the driver's license and the vehicle registration, and may do so by requesting a computer check." Purcell, 236 F.3d at 1278 (internal citations omitted).  Similarly, in the interest of the officer's safety, officers may prolong a detention while awaiting the results of a criminal history check that is part of the officer's routine traffic investigation.  Id. In addition, an officer may prolong a traffic stop if he has "articulable suspicion of other illegal activity."  Id. at 1277; see Boyce, 351 F.3d at 1106.  An officer may also prolong a detention with the consent of the detainee.  See United States v. Tapia, 912 F.2d 1367, 1370 (11th Cir. 1990) (applying Terry standard "[i]n the absence of consent.").

Law enforcement officers without a warrant may conduct a search based upon an individual's voluntary consent, and evidence discovered and seized during such a search may be admitted at trial. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) ("[i]t is . . . well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent.").  Consent may be express or

8

implied but need not necessarily be knowing and intelligent. <u>Id.</u> at 241, 248.[3] The burden is on the prosecution to prove that consent was obtained properly. <u>Id.</u> at 235; <u>Bumper v. North Carolina</u>, 391 U.S. 543, 548 (1968). In order for consent to be deemed voluntary, it "must be the product of an essentially free and unconstrained choice." <u>United States v. Zapata</u>, 180 F.3d 1237, 1241 (11th Cir. 1999) (<u>quoting</u> <u>United States v. Garcia</u>, 890 F.2d 355, 360 (11th Cir. 1989)).

Whether or not voluntary consent has been given is a question of fact determined by examining the totality of the circumstances. <u>Schneckloth</u>, 412 U.S. at 226-27; <u>United States v. Gonzales</u>, 71 F.3d 819, 832 (11th Cir. 1996); <u>Tukes v. Dugger</u>, 911 F.2d 508, 517-18 (11th Cir. 1990). Various factors may be considered in determining whether consent is voluntary, including: (1) an individual's knowledge of the right to refuse consent, <u>Schneckloth</u>, 412 U.S. at 227; (2) his or her youth, <u>Id.</u>; (3) the defendant's intelligence or education, <u>U.S. v. Ramirez-Chilel</u>, 289 F.3d 744, 753 (11th Cir. 2002); (4) the degree to which the defendant cooperates with the police, <u>Id.</u>; (4) the defendant's attitude about the likelihood of discovery of illegal substances, <u>Id.</u>; and (5) the length of

---

[3] Knowledge of the right to refuse consent, however, is one factor to consider in evaluating voluntariness. <u>Schneckloth</u>, 412 U.S. at 227.

9

detention and the nature in which the defendant is questioned, including physical punishment or other coercive police behavior, Schneckloth, 412 U.S. at 226. No single factor is dispositive. Id. at 226-27; Purcell, 236 F.3d at 1281; United States v. Butler, 102 F.3d 1191, 1197 (11th Cir. 1997).

**B. The Law Applied**

First, with regard to the validity of the initial stop, it appears that the initial stop was based upon Trooper Barber's reasonable belief that two traffic violations had occurred: following too close and having a tag cover obscuring the license tag. The officer observed these violations himself and his credibility has not been questioned. Therefore, there was probable cause to make the stop, and the initial stop was valid.

Secondly, the duration of the stop was not unconstitutionally extended. Under Terry, an officer's actions during a traffic stop must be "reasonably related in scope to the circumstances which justified the interference in the first place." 392 U.S. at 20. Furthermore, the duration of the traffic stop must be limited to the time necessary to effectuate the purpose of the stop. Purcell, 236 F.3d at 1277 (11th Cir. 1999). More precisely, the issue is whether the duration was impermissibly extended, not whether the officer asked unrelated questions of Defendant about his itinerary or family relationships. See Muehler v. Mena, 544 U.S. 93, 100-102 (2005)

(rejecting the lower court's holding that officers were required to have independent reasonable suspicion in order to question Defendants about matters outside the scope of the stop); see also United States v. Hernandez, 418 F.3d 1206, 1209 (11th Cir. 2005).

In this case Trooper Barber processed the violation within a reasonable time: approximately fifteen minutes.[4] During this time he was investigating Defendant's driver's license and insurance and printing out and preparing the warning notices that he gave to Defendant. As the Eleventh Circuit mused recently in a footnote in Hernandez, "[w]here at its inception a traffic stop is a valid one for a violation of the law, we doubt that a resultant seizure of no more than seventeen minutes can ever be unconstitutional on account of its duration: the detention is too short." 418 F.3d at 1212 n.7; see also Purcell, 236 F.3d at 1279 (fourteen minutes not unreasonable); United States v. Gonzalez, 275 Fed.Appx. 930, 933 (11th Cir. 2008)(eight to ten minutes not unreasonable). In this case the duration, at approximately fifteen minutes, was not unconstitutionally extended.

---

[4] A review of the video confirms that the process from the stop to the return of Defendant's license and insurance required approximately fifteen minutes, consistent with Trooper Barber's estimate of ten to fifteen minutes. See T. (32-33); see also [Gov. Exh. 6].

11

After Trooper Barber returned Defendant's driver's license and insurance information to him and gave him the warning tickets, the official portion of the encounter was complete. At that point the encounter became consensual when Defendant agreed to talk further with the Trooper and answer a few more questions. He was not compelled to talk further; he was not under arrest; and, as far as a reasonable innocent person would have perceived it, he was free to go.[5] "[W]here a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter, the encounter with the police is consensual, and the Fourth Amendment is not implicated." United States v. Ramirez, 476 F.3d 1231, 1237-38 (11th Cir. 2007) (citations omitted) (post-citation discussion consensual); see also Ubaldo-Viezca, 2010 WL 3895710 (11th Cir. 2010) (after warnings issued, title and licenses returned, stop became consensual encounter).

After Trooper Barber issued the warnings to Defendant and returned his license and insurance card, he asked Defendant orally for consent to search. Defendant orally consented. This request was made within two to three minutes of the return of Defendant's license, insurance card, and receipt of the warnings. Also within

---

[5] As the Trooper testified, from his perspective, "He [Defendant] could have said I am leaving and he could have left", despite the fact that in the Trooper's mind, Defendant was not free to go. [62].

this same time frame Defendant signed a written consent, in Spanish, permitting the officers to search. See [Gov. Exh. 3].[6] There was no evidence of any coercion and no evidence that either the oral or the written consent was not voluntary, or that Defendant did not understand what he was consenting to. Any language difficulty was addressed by providing Defendant with the written consent form in Spanish. The undersigned concludes that the consent was valid.

As for the scope of the consent, the written consent broadly provided that the troopers could search the vehicle, to include "the removal of any suspicious paneling or other vehicle components and the least intrusive access to any constructed compartment used for the purposes of concealing contraband." See [Gov. Exh. 4]. Given that Defendant agreed that the vehicle be taken from the side of the road to the State Patrol Post, where it was searched in the parking lot, it does not appear that the Troopers exceeded the scope of the consent language in inspecting the vehicle and exploring the suspicious condition of the frame rails and the drain holes, which led to the discovery of the packages.

In sum, on all issues, it appears that the validity of the stop, consent, and search should be upheld.

---

[6] Government Exhibit 4 is the English translation of Government Exhibit 3.

13

## IV.
## Conclusion

In conclusion, **IT IS RECOMMENDED** that the motion to suppress [Doc. 17] be **DENIED**. In addition, it appearing that there are no pretrial or discovery matters to bring before the undersigned, it is therefore **ORDERED** that this **CASE** be and is hereby **CERTIFIED** as ready for trial.

**SO REPORTED AND RECOMMENDED** this 17th day of February, 2011.

*/s/ E. Clayton Scofield III*
E. Clayton Scofield III
United States Magistrate Judge